UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-CR-10034-LEIBOWITZ

UNITED STATES OF AMERICA

v.

LUIS ARNULFO OCAMPO MARTINEZ,

    **Defendant.**
_____/

## UNITED STATES OF AMERICA'S MOTIONS *IN LIMINE*

Defendant Luis Arnulfo Ocampo Martinez is charged with one count of making false statements to the U.S. Citizenship and Immigration Services ("USCIS"), in violation of 18 U.S.C. § 1001(a)(3) and one count of simple assault of a federal officer, in violation of 18 U.S.C. § 111(a)(1) (DE 25). Trial is scheduled to begin on February 5, 2026, in the Key West Division. Through this Motion, the United States seeks to streamline the proceedings at trial. The parties have conferred but cannot reach an agreement on the proposed motions *in limine*.

The United States moves *in limine* for admission of:

(1) Documents from the Defendant's Alien File ("A-File") and the Electronic Immigration System ("ELIS"), which include but is not limited to:

    a) Records of the Defendant's encounters with immigration officials at the U.S. border;

    b) Documents generated by immigration officials and the Immigration court regarding removal proceedings; and

    c) Applications for immigration benefits that were submitted by the Defendant to USCIS, along with any supporting materials.

(2) Documents from the A-File belonging to N.S.P., whom the Defendant identified as his "minor brother" during a 1998 encounter with U.S. Border Patrol ("USBP") agents, which include:

    a) Records of the minor's encounters with immigration officials at the U.S. border;

    b) Documents generated by immigration officials and the Immigration court regarding removal proceedings; and

    c) Applications for immigration benefits that were submitted by the minor to USCIS, along with any supporting materials.

(3) Testimony from a USCIS Supervisory Immigration Officer who belongs to the Fraud Detection Unit. The witness would testify to her review of the A-file and the materiality of the Defendant's false statements.

The United States additionally moves *in limine* to exclude any argument, evidence, or reference regarding:

(1) *United States v. Santos Manuel Cordon Manjivar*, 25-cr-10015-GAYLES, a prior 18 U.S.C. § 111(a)(1) case in which another defendant pled guilty to assaulting the federal officer who is the same victim in this case, B.C. ("Victim");

(2) Social or other public media concerning unrelated enforcement activity that involves or references the Victim, including but not limited to:

    a) Content uploaded to YouTube in June 2025 by the account "Canela News," regarding an encounter with a purported U.S. legal permanent resident;

    b) Content uploaded to Facebook and Substack on July 21, 2025, regarding the temporary detention of a bystander during the Victim's arrest of another individual; and

    c) An online article uploaded to the "Oxford American" in September 2025, in which a national of Northern Ireland describes his purported encounter with immigration authorities.

(3) The Defendant's age, lack of criminal history, family circumstances, and potential penalties if convicted; and

(4) Immigration policy or charging decisions.

I.     **FACTUAL BACKGROUND**

    A. **The Defendant's Assault of the Victim**

In the early morning of July 1, 2025, the Victim, an agent with the United States Border Patrol ("USBP") was patrolling an area near Key West, Florida, in the Victim's unmarked vehicle.

The Victim was accompanied by Antonio Carmona, a Florida State Probation Officer ("FSPO"). The Victim and FSPO Carmona saw a white van and began to follow it. The officers noticed that the white van began to swerve lanes and run past stop signs, and the driver kept looking into his side view mirror. As a result, the Victim activated his emergency lights and ordered the van to stop.

The Victim got out of his car and walked toward the driver's side to speak with the driver. As the Victim approached, the driver, later identified as the Defendant, suddenly opened the driver's door and tried to run. The Victim announced that he was an USBP agent and ordered the Defendant to stop. An altercation ensued, during which the Defendant shoved the Victim, causing the Victim to lose his balance. As he regained his footing, the Victim tried to restrain the Defendant by grabbing the Defendant's left shoulder and right bicep.

However, the Defendant broke free and tried to overpower the Victim by pushing his head backward while grabbing the Victim's arm with his other hand. The Victim lost his balance a second time as the Defendant continued to apply force. As a result, the Victim struck the Defendant on the right cheek with a closed fist three or four times. The Defendant finally let go of the Victim and bolted into the nearby mangroves. The Victim pursued the Defendant and applied a shoulder lock from behind. FSPO Carmona quickly intervened and helped subdue the Defendant, dropping the Defendant to the ground. The Defendant was handcuffed and placed inside the Victim's vehicle. While inside, the Defendant violently kicked the metal cage separating the passenger area with his heavy-duty boots. The Defendant was ordered to stop, but he refused to do so. A second USBP agent arrived moments later in a separate vehicle and helped the Victim and FSPO Carmona with transporting the Defendant to the Marathon Border Patrol Station.

## B.  The Defendant's Immigration Records and Prior Statements to USCIS

After the Defendant was detained and charged in an Information with assaulting a federal officer (DE 13), a closer review of his immigration records revealed that the Defendant had been flagged in a potential fraud investigation by USCIS's Fraud Detection and National Security Unit. The investigation showed that, in 2023, the Defendant applied to adjust his immigration status to that of a lawful permanent resident using an A number ending in 326. In connection with the application, the Defendant submitted fingerprints. USCIS learned that the fingerprints matched those of an individual named Luis Arnulfo Sanchez Pena, a name later determined to be an alias used by the Defendant, who had been assigned an A number ending in 370 and was ordered removed from the United States by immigration judge in 1998.

### i.  *The 1998 Border Encounter*

Records from the A-file corresponding to A-number ending in 370 show that, on February 15, 1998, the Defendant was apprehended at the border while traveling with a minor. The Defendant was interviewed, and he admitted having swam across the Rio Grande River to enter the United States and to avoid being inspected by immigration officials. At the time, the Defendant represented that the minor's initials were "N.S.P." and that the minor was his younger brother. The Defendant provided border agents with information regarding the minor's identity, nationality, and manner of entry into the United States. He claimed that their father was "Jose Osman Sanchez" and their mother "Leonore Modesta Pena." Records from N.S.P.'s A-file show that the Defendant signed several forms on the minor's behalf.

Because of the lack of detention space for family units, the Defendant and the minor were processed for removal proceedings and were released pending their immigration removal hearing. The Form I-213, Record of Inadmissible Alien, indicated that the Defendant had provided a

4

Houston, Texas address (the "Houston Address") as the place where he could be reached while awaiting his removal proceedings. The Form I-213 further noted that the Defendant and the minor were given hearing dates and given instructions on how and when to appear. The Defendant was ordered to appear before an immigration judge on September 30, 1998, at 9:00 a.m. The Defendant and the minor brother were each provided with the necessary forms, including a list of legal service providers, and a change of address form.

        ii.    *The Removal Proceedings*

After USBP agents released the Defendant and his purported brother, court records indicate that a Notice of Hearing in Removal Proceedings was served by mail at the Houston Address, which noticed a removal hearing to occur on September 20, 1998. The Notice of Hearing warned that failure to appear at the September 30th removal hearing could result in the hearing being held in the Defendant's absence and entry of a removal order.

The Defendant did not appear as ordered. As a result, the immigration judge ordered the Defendant removed to Honduras on September 30, 1998. Court records show that the decision of the immigration judge was mailed to the Houston Address.

        iii.    *The TPS Applications*

About five months later, on February 6, 1999, the Defendant applied for Temporary Protected Status ("TPS"). In that application, the Defendant did not disclose the prior removal proceedings or the alternate identity he had used during the 1998 border apprehension. Attached to the application were copies of the Defendant's identification documents, including a Florida identification card issued on April 29, 1998, and a Florida driver's license issued on November 4, 1998. The identification documents bore the name "Luis Ocampo Martinez." Additionally, the Defendant submitted his purported birth certificate, issued by Honduran authorities. The certificate

5

indicated that the Defendant was born Luis Arnulfo Ocampo Martinez in Honduras, on October 27, 1970, and that his father was "Ranulfo Ocampo" and his mother "Esperanza Martinez." The form also asked, "Are you now or have you ever been under Immigration Proceedings?" The Defendant checked the box "no."[1] The Defendant remained in the United States under TPS and continued to submit TPS renewal applications over the years.

### iv.   *The 2023 Application to Adjust Status*

On April 15, 2023, the Defendant signed and dated his Form I-485 Application to Adjust Status. In doing so, he certified under penalty of perjury that the information in the application was provided and authorized by him, that he had reviewed and understood all the information contained in it, and that all the information was complete, true, and correct. Under Part 1 of the Form I-485, "Information About You," the Defendant wrote that his current legal name was "Luis A. Ocampo." Directly below, under "Other Names You Have Used Since Birth," the Defendant wrote "Luis Arnulfo Ocampo Martinez." He did not disclose the name "Luis Arnulfo Sanchez Pena."

Additionally, a review of the Form I-485 shows that the Defendant answered "No" to the following questions:

> Are you presently or have you **EVER** been in removal, exclusion, rescission, or deportation proceedings?
>
> Have you **EVER** been arrested, cited, charged, or detained for any reason by any law enforcement official (including but not limited to any U.S. immigration official or any official of the U.S. armed forces or U.S. Coast Guard)?"
>
> Have you **EVER** failed or refused to attend or remain in attendance at any removal proceedings filed against you on or after April 1, 1997?

On October 16, 2023, USCIS sent a Request for Evidence letter to the Defendant informing him that USCIS needed further evidence in addition to the information he provided in his Form I-

---

[1] An applicant may still be eligible for TPS notwithstanding a final order of removal.

485 application. On May 15, 2024, USCIS send a Note of Decision letter to the Defendant informing him that his Form I-485 application was being denied because USCIS did not have jurisdiction to decide whether he was eligible for adjustment of status since an Immigration Judge had entered a Final Removal Order against him on September 30, 1998.

      v.    *The May 2025 Application to Renew TPS*

On May 21, 2025, about six weeks before his arrest, the Defendant filed a registration application for TPS. In connection to the question "have you ever failed to attend or remain in attendance at any immigration proceedings to determine our admissibility or deportability," the Defendant submitted the following statement: "On May 15, 2024, USCIS denied my [I-]485 petition and for the first time[,] I was notified that there was a deportation order issued against me. I requested the FOIA and found an unknown proceedings [sic] from 1998. My lawyer is filing a motion to reopen and terminate based on Carcecen settlement." Additionally, the Defendant disclosed for the first time that he has previously used the name "Luis Arnulfo Sanchez Pena."

**II.    LEGAL STANDARD**

District courts enjoy broad discretion in determining whether to grant a motion *in limine*. *Quantum Capital, LLC v. Banco De Los Trabajadores*, 720 F. App'x 539, 540 (11th Cir. 2017). The goal of a motion *in limine* is to avoid the futile attempt of "unring[ing] the bell" when jurors have seen or heard inadmissible evidence, even when stricken from the record. *See Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003). Motions *in limine* also serve to streamline trials, by settling evidentiary disputes in advance and by minimizing side-bar conferences and other disruptions at trial. *See United States v. Tokash*, 282 F.3d 962, 968 (7th Cir. 2002).

**A.  Federal Rule of Evidence 402**

"Evidence which is not relevant is not admissible." Fed. R. Evid. 402. Evidence is relevant

only if it has "any tendency to make the existence of an element slightly more [or less] probable than it would be without the evidence." *Jackson v. Virginia,* 443 U.S. 307, 320 (1979). In other words, only evidence that is relevant to the elements of the charge against the defendant, or to a legal defense, is admissible at trial. *See* Fed. R. Evid. 402. Although a defendant is entitled to confront witnesses and to present a defense, he has no right to present irrelevant evidence. *United States v. Anderson*, 872 F.2d 1508, 1517 (11th Cir. 1989). The Court has discretion to determine which issues are relevant to the proceedings. *See United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1364 (11th Cir. 1994) (citing *United States v. Wasman*, 641 F.2d 326, 329 (5th Cir. 1981)).

### B. Federal Rule of Evidence 403

Even if evidence offered by a defendant has probative value, it is properly excluded under Rule 403 of the Federal Rules of Evidence. That rule provides, in its pertinent part:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time . . . .

Fed. R. Evid. 403; *see also Anderson*, 872 F.2d at 1519 ("Whatever probative value that [the appellants's] participation in a prior covert operation had to this case, the admission of evidence regarding the details of those activities would only serve to impermissibly divert the jury's attention away from the basic charges in this indictment.").

### C. Federal Rule of Evidence 608(b)

Under Federal Rule of Evidence 608(b), "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed R. Evid. 608. Alternatively, "the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of [] the witness." *Id*. But extrinsic evidence offered

for other grounds of impeachment—such as contradiction, bias, and mental capacity—remains restrained by Rules 402 and 403. *See, e.g.*, *United States v. Novaton*, 271 F.3d 968, 1004–07 (11th Cir. 2001) (upholding the exclusion under Rule 403 of pending allegations against law enforcement witness during trial, finding that "insertion of unproven allegations [] had the obvious potential to cause serious and unfair prejudice to the government," adding that "the appellants have failed to show any basis for attributing bias to [the witness] because of the investigations.").

### III.   ARGUMENT

#### A. Motions *in Limine* to Admit

##### i. *The Court Should Admit Documents from the Defendant's A-File and ELIS*

The United States intends to offer several documents from the Defendant's A-File and ELIS to prove the elements of the offense with which the Defendant is charged. The Defendant can be found guilty of Count 1 only if the United States proves that the Defendant made the statements as charged; that the statements were false, that the falsity concerned a material matter; that the Defendant acted willfully—knowing the statements were false; and that the statements were made for a matter within the jurisdiction of an agency of the United States. *See* Eleventh Circuit Pattern Jury Instructions, Offense Instruction No. O36 (2025).

The United States will establish these elements through specific documents, such as the 1998 Record of Deportable/Inadmissible Alien (Form I-213); the Order of Removal (Form I-205); the Notice to Appear (Form I-265); the Notice of Rights and Request for Disposition (Form I-770); the Notice of Hearing from the Immigration Court; and a 1999 Application for Temporary Protected Status (I-821). Other relevant documents include files kept in USCIS's ELIS, including the Defendant's 2023 Application to Adjust Status, the USCIS's 2024 Notice of Decision, and the Defendant's 2025 Application for Temporary Protected Status.

These documents are relevant to show alienage, prior removal proceedings, and the Defendant's sworn statements. Together, they show that the Defendant made the statements as charged, that is: a) that the only other name he had ever used was "Luis Arnulfo Ocampo Martinez;" b) that he had never been in removal proceedings; c) that he had never been arrested or detained or any reason by any law enforcement official (including but not limited to any U.S. immigration official); and d) that he had not failed or refused to attend removal proceedings. Additionally, these files tend to prove that the falsity of those statements were material and were made for a matter within the jurisdiction of USCIS, an agency of the United States.

The Court should admit these A-File documents as "public records" under Federal Rule of Evidence 803(8). *See, e.g.*, *United States v. Agustino-Hernandez*, 14 F.3d 42, 43 (11th Cir. 1994) ("We hold that admission of routinely and mechanically kept I.N.S. records, such as the I-194 form and warrants of deportation, does not violate Rule 803(8)(B)."). The Eleventh Circuit has held that documents kept in an A-file do not violate a defendant's rights under the Confrontation Clause because they are routinely prepared by the immigration authorities and not in preparation for trial. *See United States v. Carabello*, 595 F.3d 1214, 1226 (11th Cir. 2010) (affirming the admissibility of the biographical data portions of I-213 forms under the rules of evidence and the Confrontation Clause because they are "routinely completed by Customs and Border Patrol agents in the course of their non-adversarial duties, not in the course of preparing for a criminal prosecution").

The United States may authenticate these documents by offering witness testimony pursuant to Federal Rule of Evidence 803(6), 901(b)(1), or 901(b)(7). During its case-in-chief, the United States intends to call USCIS Supervisory Immigration Officer Natalie Diaz, an investigator with the USCIS Fraud Detection and National Security Unit ("FDNS"). In addition to leading fraud investigations, Officer Diaz has experience adjudicating immigration benefits

10

and reviewing applications on behalf USCIS. Before assuming her current role, Officer Diaz worked as an adjudications officer for three years and as a senior adjudications officer for another three years. Officer Diaz has adjudicated thousands of applications for immigration and naturalization benefits. Based on her training and years of experience within the field, Officer Diaz has knowledge of USCIS regulations, statutes, and procedures concerning immigration benefit applications. Thus, she would properly authenticate ELIS records and documents from the Defendant's A-file.

    **ii.** *The Court Should Admit Documents from the Purported Minor Brother's A-File*

  Similarly, the United States seeks to introduce certain documents from N.S.P.'s A-file. During the 1998 encounter near Brownsville, Texas, the Defendant told border officials that the minor who was traveling with him, N.S.P., was his younger brother. The Defendant provided the minor's biographical information and signed several documents on the minor's behalf. The purported brother's A-file confirms that the Defendant told border officials that they shared the same set of parents, "Leonore Modesta Pena" and "Jose Osman Sanchez."

  Further, N.S.P.'s A-file shows that the Defendant signed at least three forms in 1998 on the minor's behalf using the name "Luis Sanchez." Those documents include the Notice to Appear (Form I-862), the List of Free Legal Services Providers, and the Change of Address Form. The words "signature of brother" appears next to each signature. Additionally, N.S.P.'s A-file shows that, about a year later, in 1999, N.S.P. applied for TPS and represented that his mother was "Leonore Modesta Dugall" not "Leonere Modesta Pena."

  Altogether, the documents shows that when he was apprehended at the border, the Defendant repeatedly asserted that his name was Luis Sanchez Pena, signing both sets of documents as "Luis Sanchez". And yet, when he applied for a Florida identification card two

months later, in April 1998, he stated that his name was Luis Ocampo Martinez. Then, in January 1999, when he applied for TPS, he stated that his name was Luis A. Ocampo and submitted a Honduran birth certificate indicating that his mother's name was Esperanza Martinez, not Leonore Modesta Pena.

The files from N.S.P.'s A-file negates a claim that border agents misunderstood the Defendant or inaccurately recorded his biographical information. N.S.P.'s documents corroborate that the Defendant acted knowingly and willfully when, years later, he denied having used any name other than Luis Arnulfo Ocampo and when he denied ever been detained by law enforcement officials or being placed in removal proceedings. The documents advance the United States's theory that the Defendant willfully omitted and denied certain facts because he knew that his prior use of a false identity and his prior immigration detention made him ineligible for lawful permanent resident status. Accordingly, N.S.P.'s documents are relevant to the elements of the case. Like the Defendant's A-file, these documents are admissible as "public records" under Federal Rule of Evidence 803(8) and would be authenticated by witness testimony under Rules 803(6), 901(b)(1), or 901(b)(7). The United States respectfully asks that it be allowed to rely on such documents in its case-in-chief.

### iii. *The Court Should Admit the Testimony of USCIS Supervisory Officer Natalie Diaz*

The United States intends to elicit testimony from USCIS Supervisory Officer Natalie Diaz, about her review of the two A-files and the Defendant's ELIS records. Officer Diaz will testify based on her training and experience about: 1) the Defendant's Application to Adjust Status (Form I-485), and the submission process; 2) USCIS regulations, statutes, and procedures concerning immigration applications and eligibility; 3) how USCIS statutes, regulations, and procedures are applied in practice; and 4) how USCIS's investigates and adjudicates immigration

12

applications based on the information contained within those applications.

Officer Diaz is also expected to testify as to the materiality of the Defendant's false statements. This testimony will be based on Officer Diaz's particularized knowledge garnered from years of experience in the field and properly falls within Federal Rule of Evidence 701's provision for lay witness testimony. A witness is permitted to deliver a lay opinion testimony based on her professional experiences if the testimony is 'rationally based' on those experiences, rather than on scientific or technical knowledge. *United States v. Williams*, 865 F.3d 1328, 1341 (11th Cir. 2017); *see also Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co. Ltd.*, 320 F.3d 1213, 1223 (11th Cir. 2003).

And even though Officer Diaz was not personally involved with the adjudication of the Defendant's Form I-485, her testimony can still be treated as lay testimony. It does not take any specialized or technical knowledge to realize that a federal agency would be reluctant to approve an application for benefits if the agency knew that it contained false statements about material facts. *See United States v. Hill*, 643 F.3d 807, 842 (11th Cir. 2011) (explaining that opinion testimony of business owner or officer about way that company conducts its business qualified as lay testimony if based on particularized knowledge). For these reasons, the Court should permit Officer Diaz to testify about the review of the ELIS records and the two A-files, and based on that review, the denial of the Defendant's Form I-485, application to adjust status.

### B. Motions *in Limine* to Exclude

#### i. *The Court Should Exclude Evidence of an Unrelated Prior Case Involving the Victim*

The Court should exclude any evidence or argument regarding *United States v. Santos Manuel Cordon Manjivar*, Case No. 25-cr-10015-GAYLES, an earlier matter involving the same victim in this case, B.C. In that case, the defendant pled guilty to an Information charging that

"[o]n or about April 14, 2025, in Monroe County . . . the defendant . . . did forcibly assault, resist, oppose, impede, intimidate, and interfere with "B.C," . . . and in the commission of the offense, did commit simple assault, in violation of Title 18, United States Code, Section 111 (a)(l)." *See Manuel Cordon Manjivar*, Case No. 25-cr-10015-GAYLES, at DE 8. Notably, the defendant in that case was represented by AFPD Ian McDonald, the same AFPD representing the Defendant in this case. But *Cordon Manjivar* has no bearing on the issues in this case.

There, the defendant entered a plea of guilty at arraignment, less than three weeks after his arrest. Given the early disposition of the case, the public record and docket contains little to no information regarding the underlying facts or surrounding circumstances and there is no basis to conclude that the Defendant knew about this incident when he was arrested on July 1, 2025. More importantly, the defendant in that case admitted to assaulting the Victim, contrary to the Defendant's position in this case. Accordingly, information or argument regarding *Cordon Manjivar* has no probative value and would serve only to confuse the issues and try to portray the Victim in a negative light.

Even if marginally relevant, the evidence is inadmissible under Rule 403. Reference to this earlier incident would invite speculation about facts not in evidence and risk misleading the jury. Any probative value is substantially outweighed by the risk of unfair prejudice to the Government's case.

        **ii.** ***The Court Should Exclude Public Media Reports of Unrelated Incidents that Might Involve the Victim.***

The Court should exclude evidence or argument regarding recent media coverage that contains references to the Victim and USBP's immigration enforcement activities. To date, the United States is unaware of any media reports regarding the Defendant's arrest on July 1, 2025. However, an open-source internet search reflects that content referencing the Victim appeared

online on June 12, 2025, July 21, 2025, and September 22, 2025. That content involves incidents that are irrelevant to this case and are factually distinguishable. Any evidence or argument regarding these encounters should be excluded, as it would serve only to embarrass the Victim and imply that the Victim acted unethically, improperly, or excessively on the day of the Defendant's arrest, when there is no evidence to support such a claim. Moreover, these reports lack context and contain unverified assertions and hearsay.

1. **Content Uploaded to YouTube in June 2025 by the Account "Canela News," Regarding an Encounter with a Purported U.S. Legal Permanent Resident**

On June 12, 2025, the account "Canela News" shared a YouTube video in which a reporter appears to question a woman regarding her encounter with immigration authorities. During the interview, the woman alleged that she was harassed and mistreated by ICE agents and that her husband was subsequently taken into custody for removal proceedings. The report contains purported video footage of the woman's encounter with agents, which depicts the Victim holding the woman by the wrist as he is questioning her. The video and other edited versions appear to have been disseminated on Instagram by the accounts @canela_news and @liveintheus.law.

Evidence and argument regarding this incident and the accompanying media coverage should be excluded. Even assuming that the Defendant had seen the video, footage of the Victim briefly detaining another individual to conduct questioning does not provide any justification or explanation for the Defendant's later resistance and use of force in this case. The evidence in this case shows that the Defendant shoved and pushed the Victim and that he bolted toward the mangroves even though the Victim had announced he was as USBP officer and ordered him to remain in place. Unlike the incident depicted in the Canela News report, in this case, the Defendant attempted to flee, and a second law enforcement officer had to intervene to help subdue the

Defendant. The Defendant continued to defy officers when he was placed in the Victim's vehicle—kicking the metal cage with his heavy-duty boots. Accordingly, the offense conduct here is separate and distinguishable from the incident that was reported by Canela News. Moreover, this unrelated incident is not probative of the Defendant's state of mind or any legal defense.

### 2. Social Media Content Regarding the Temporary Detention of a Bystander Present During the Victim's Arrest of Another Individual on July 21, 2025

On July 21, 2025, the Instagram account @gwenfilosamedia shared a video clip depicting the Victim as he conducted an arrest in Key West. The caption states in part: "A U.S. Customs and Border Protection agent took a Key West resident into custody on Monday, July 21, 2025. [The bystander] was observing an immigration arrest in downtown Key West when a federal agent took issue with him recording and remarks he made." The video and other versions of it, were published on Facebook by at least two accounts, "Gwen Filosa Media Key West" and "Wayne Dasper." A few days later, on July 27, 2025, a Substack account operating under the name "Key West Newswire by Gwen Filosa" shared a video that was purportedly taken by the bystander himself on his own device.

Evidence or argument regarding this later-in-time incident should be excluded. The incident and accompanying media are irrelevant and would confuse the jury given that the encounter occurred on July 21, 2025, nearly three weeks after the Defendant's arrest. And based on the description, the encounter unfolded as the Victim was arresting a third party and the bystander recorded the arrest from a distance and made remarks at the Victim. The video clip shows that the Victim approached the bystander, and the bystander ultimately complied with the Victim's orders. Here, the Defendant forcibly resisted by shoving and grabbing the Victim in an effort to break free and impede his own arrest. Unlike the bystander, the Defendant repeatedly

16

refused to comply with the Victim's instructions. Thus, evidence of the encounter with the bystander would not advance a theory of defense and would be offered only to portray the Victim in a bad light and suggest that he deserved being assaulted.

> **3. An Article Uploaded to an Online Magazine in September 2025 in Which a National of Northern Ireland Described His Purported Encounter with Immigration Authorities**

Similarly, the Court should exclude argument or evidence of an article published on September 22, 2025—months after the Defendant's arrest—in which a national of Northern Ireland is interviewed regarding his apprehension on June 12, 2025. The article was published on an online platform known as the "Oxford American." In the article, the individual recounts his encounter with immigration authorities and alleges that, as he waited at the Marathon Border Patrol Station, the Victim laughed at him and threatened to hurt him.

These statements are unverified, out-of-court accusations concerning an unrelated encounter that is factually and legally distinct from the Defendant's case. They are not probative of the charged conduct and would serve only to inflame the jury and invite speculation. Moreover, evidence related to this encounter would not aid the Court in evaluating the Victim's credibility.

> ### iii. *The Court Should Exclude References to the Defendant's Age, Lack of Criminal History, Family Circumstances, and Potential Penalties*

Evidence and argument referring to the Defendant's age, lack of criminal history, family circumstances, and his relatives' lawful immigration status is irrelevant and thus is inadmissible. Fed. R. Evid. 402. Even if relevant, Rule 403 provides that relevant evidence may be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." Fed. R. Evid. 403. The Eleventh Circuit Pattern Jury Instructions expressly instruct jurors to "not be influenced in any way by either sympathy for or prejudice against the Defendant or the Government." Eleventh Circuit Pattern Jury Instructions, Criminal Cases, B2.1 (2025).

In other words, the Defendant should be prevented from arguing for, or advancing evidence aimed at, jury nullification. "[T]he jury enjoys no right to nullify criminal laws, and the defendant enjoys a right to neither a nullification instruction nor a nullification argument to the jury[.]" *United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998). The Court should exclude commentary, questioning, evidence and argument intended solely to invoke sympathy for the Defendant, such as:

- Statements that the Defendant is a husband, father and/or grandfather;

- References or allegations that the Defendant's immediate relatives are U.S. citizens or have lawful immigration status;

- References to the Defendant's contributions to his family and/or society and/or the Defendant's relative lack of criminal history; and

- References to any pre-immigration hardships, generalized conditions in Honduras (poverty, violence, etc.), the pursuit or purported loss of the "American Dream," and the Defendant's fear of returning to Honduras.

Further, it is "established canon that juries are not to be informed of or concerned with the consequences of their verdicts" *United States v. Thigpen*, 4 F.3d 1573, 1577 (11th Cir. 1993).  This is because such information tends "to draw the attention of the jury away from their chief function as sole judges of the facts, open the door to compromise verdicts and to confuse the issue or issues to be decided." *Id.* (quoting *Pope v. United States*, 298 F.2d 507, 508 (5th Cir. 1962)). Thus, the defense should be precluded from urging the jury to consider the potential punishment and refrain from "sending" the Defendant away for months or years. The Government further moves to preclude the defense from arguing that the Defendant will likely be removed from the United States following the conclusion of the trial or that he may become ineligible for certain immigration benefits.

### iv. *The Court Should Exclude References to Immigration Policy or Charging Decisions*

National immigration policy and the charging decisions of the Department of Justice have been a divisive and debated issue throughout the United States. But those issues are not relevant to the questions the jury will decide in this case, and mention of them would be unduly prejudicial. Therefore, the Court should preclude any reference or questioning related to those topics at trial under Federal Rule of Evidence 401 and 403. Those discussions are, however, appropriate during jury selection to determine whether a potential juror could be fair and impartial, so the United States does not object to questions about immigration policy and related topics in that context only.

## CONCLUSION

For the reasons set forth above, the United States's Motions *in Limine* should be granted.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

Date: January 7, 2025        By:    */s/ Andrea Montes*
                                    Andrea Montes
                                    Assistant United States Attorney
                                    Florida Bar No.1016182
                                    99 Northeast 4th Street
                                    Miami, Florida 33132
                                    Telephone: (305) 961-9417
                                    Email: Andrea.Montes@usdoj.gov

                                    */s/ Melissa Roca Shaw*
                                    Melissa Roca Shaw
                                    Special Assistant United States Attorney
                                    FL Bar No. 99628
                                    99 Northeast 4th Street
                                    Miami, Florida 33132
                                    (305) 961-9340
                                    melissa.shaw@usdoj.gov

## **CERTIFICATE OF SERVICE**

      I CERTIFY that on January 7, 2026, I electronically filed this document with the Clerk of the Court using CM/ECF.

      */s/ Andrea Montes*
      Andrea Montes
      Assistant United States Attorney